# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE

### Assigned on Briefs February 27, 2013 at Knoxville

## STATE OF TENNESSEE v. DEMEKO GERARD DUCKWORTH

**Appeal from the Criminal Court for Davidson County**
**No. 2010-D-3314      Cheryl Blackburn, Judge**

**No. M2012-01234-CCA-R3-CD      Filed May 10th, 2013**

The defendant, Demeko Gerard Duckworth, appeals his Davidson County Criminal Court jury convictions of two counts of first degree murder, one count of attempted first degree murder, and one count of employing a firearm during a dangerous offense, claiming that the trial court erred by denying his motion to sever offenses, that the evidence was insufficient to support his convictions, and that the trial court erred by imposing partially consecutive sentences. Because we discern no reversible error, the judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Jeffrey Devasher (on appeal), and Melissa Harrison and Mike Engle (at trial), Assistant District Public Defenders, for the appellant, Demeko Gerard Duckworth.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case are the result of two separate incidents that occurred in Nashville on July 19, 2010. The defendant shot Clarence Goins and Patrick Stanford outside a residence on Hillside Drive in Nashville at approximately 9:35 p.m. on July 19, 2010. As Mr. Goins's family members gathered at the hospital to await news of his condition, relatives noticed that Asia Wade, who was Mr. Goins's cousin and the defendant's

girlfriend, was not at the hospital. When attempts to contact her were unsuccessful, family members went to Ms. Wade's residence the next day and found her strangled and stabbed inside her locked bedroom. Her children reported last seeing Ms. Wade alive when she entered the bedroom with the defendant on the previous evening. Mr. Goins succumbed to his injury shortly before Ms. Wade's body was discovered. Mr. Stanford survived a serious gunshot wound to his leg.

At trial, Tykee Holloway testified that he was wounded and that his brother, Michael Johnson, was killed during a shooting at their 1217 Hillside Avenue residence on June 9, 2010. Mr. Holloway said that he had known the defendant for several years as a friend of Mr. Johnson when the family lived in Forrest City, Arkansas. Mr. Holloway testified that the defendant often visited his family after they moved to Nashville, sometimes staying with Mr. Holloway and Mr. Johnson and sometimes with his girlfriend, whose name was Asia and who drove a red Monte Carlo. Mr. Holloway said that his mother, Donita Holloway, lived at 1227 Hillside Avenue.

Mr. Holloway testified that on July 19, 2010, he purchased a meal at Church's Chicken and returned to his mother's residence to eat. As he was eating, his sister, Briana Holloway, entered the front room of the house and told him that the defendant wanted him to come outside. He said that he told her, "[T]ell Meko no, f*** himself." Mr. Holloway explained that he responded as he did because he and the defendant had "a little" disagreement at that time. Mr. Holloway recalled that the defendant came into the house shortly thereafter and said "he just killed his b**** and he fixing to go down here and kill Murda or old boy." "Murda," whose real name Mr. Holloway did not know, lived in the neighborhood. Mr. Holloway said that he warned the defendant that the Holloway family would be forced to deal with the consequences of his killing "Murda," but the defendant did not respond and instead "left straight out." Mr. Holloway testified that he heard gunshots shortly thereafter, so he went to the door to tell his nieces to come inside. He said that when he looked outside he saw the defendant "walking up and . . . he was like, f*** you, Tykee, f*** you, you little b****."

During cross-examination, Mr. Holloway admitted that he did not see the defendant in possession of a handgun and that he did not notice any blood on the defendant's person. Mr. Holloway testified that Ms. Wade's brother, "Quisy" or Marquis Hill, had displayed threatening behavior toward his family following Mr. Johnson's murder and that Clarence Goins was Ms. Wade's cousin. Mr. Holloway recalled that other people were in the room, including his sister, Briana Holloway, and her son, Oreo, when the defendant admitted that he had killed Ms. Wade and intended to kill Mr. Goins. Mr. Holloway recalled that he actually heard two sets of gunshots after the defendant left. Mr. Holloway said that the bad feelings between him and the defendant arose because the defendant was

jeopardizing the Holloway family by spending time with Ms. Wade. He said, "It's like he putting them before us when the time we needed him."

Patrick Stanford testified that he drove to the Hillside Avenue Apartments on July 19, 2010, to visit Mr. Goins. He said that prior to the shooting, Mr. Goins, whose nickname was "Murda," had been "looking for his cousin named Poo Poo," who had Mr. Goins's telephone. He said that as he and Mr. Goins were walking down the street,

> [a] man came from behind with a hoodie on and called out to Clarence. And me and Clarence turned around. He shot Clarence in the head, and I ended up between two cars. I don't know if he was standing over the top of me or shooting at me from a distance, but bullets was flying. And I got hit in the leg.

Mr. Stanford recalled that the perpetrator wore a black hoodie but no shirt and said that he was not able to see the assailant's face. Mr. Stanford said that the perpetrator called out, "Murda, you got some salt" before beginning to shoot. Mr. Stanford said that a friend drove him directly to the hospital. He remained hospitalized for two weeks with a gunshot wound to his lower leg. Mr. Stanford insisted that neither he nor Mr. Goins was armed at the time of the shooting.

During cross-examination, Mr. Stanford said that he had never seen Mr. Goins with a gun. He confirmed that "salt" refers to cocaine. Mr. Stanford did not recall telling police that there was a second shooter who wore a red shirt.

Clementine Horne testified that on July 19, 2010, she observed a man "walking very rapidly, angry like" from "the side apartment" near her 1221 Hillside Avenue residence. That same man, she said, "called the name" and "said, you got salt." Ms. Horne said that she then saw the man, who wore a black jacket but no shirt, shooting.

Arthur Payne, Clarence Goins's father, testified that on July 19, 2010, he lived at 1211 Hillside Avenue with his son, whose nickname was "Murda." The nickname, Mr. Payne said, came from "the rapper C-Murder." On the night of his murder, Mr. Goins told Mr. Payne that he was "fixing to go to the candy lady's house." Shortly thereafter, Mr. Payne, who had gone inside their residence, heard gunshots and went outside to check on Mr. Goins. Mr. Payne testified that when he got outside, Mr. Goins lay in the street, wounded but still alive. He said that Mr. Goins was transported to the hospital for treatment but died the following day. Mr. Payne recalled that while Mr. Goins was in surgery, a number of family members came to the hospital to offer support to Mr. Payne. Mr. Payne testified that "just about the only" family member not present at the hospital was his niece, Asia Wade.

-3-

Metropolitan Nashville Police Department ("Metro") Officer Steven Bowers responded to a call of shots fired at approximately 9:35 p.m. in the area of 1217 Hillside Avenue on July 19, 2010. When he arrived at the scene, Officer Bowers observed a man lying in the parking lot with a gunshot wound to his head. The man, who was still alive, asked Officer Bowers for help. Officer Bowers testified that he called for an ambulance and asked the man who had shot him, but the victim "kept telling [Officer Bowers] that he was hurting." Officer Bowers said that he found a small bag of crack cocaine and several shell casings near the man's body but did not find any weapon. As he spoke with witnesses, Officer Bowers learned from another officer that a second shooting victim had arrived at the hospital.

Metro Crime Scene Investigator Jonesta Nolan testified that she photographed and collected four nine millimeter shell casings, one live nine millimeter round, two .380 cartridge casings, and a "bag of white substance" from the Hillside Avenue scene. She acknowledged that the .380 rounds and the nine millimeter rounds could have been fired from the same weapon because "[a] nine millimeter and a .380 are the same diameter." On cross-examination, she conceded that forensic examination of the casings could have determined whether they were, in fact, fired from the same weapon.

Detective Robert Peterson testified that he was the lead investigator into the July 19, 2010 shooting of Messrs. Goins and Stanford and in the June 9, 2010 murder of Michael Johnson at the same location. Detective Peterson said that he interviewed Mr. Stanford at the hospital while another detective interviewed Mr. Holloway, and that based on information gleaned during those interviews, he considered the defendant a suspect in the July 19, 2010 shooting. Detective Peterson recalled that as he conducted his investigation, he learned from Detective Russell Thompson that the defendant was a suspect in a second July 19, 2010 homicide. He said that he later learned that the defendant had turned himself in to authorities in Gwinnett County, Georgia on July 26, 2010, and that he traveled to Georgia to interview the defendant. An audio recording of the interview was played for the jury.

In that interview, the defendant described his purpose in traveling to Hillside Avenue on July 19, 2010, and his first interaction with Mr. Goins:

> Well, I'm not sure about everything that happened. I can't just say I'm positive about it all; but I know I did go over that night. And I was attempting to speak with Murder. He was walking up on me. And then he turned around and said something else to somebody else and then . . . he turned around and he said something else pretty much out of the ordinary.

-4-

Something about uh, you been f\*\*\*ing up or something to that nature. That kind of threw me off and I didn't know what he had on his mind. I know through the streets they say that uh, he's real sneaky. I'm guessing, you know, but all of this he say/she say. But I feel like they were trying to do something to me. He turned around and reached in his pocket; I don't know what he was reaching at; but I didn't give him time to see.

The defendant said that he interpreted Mr. Goins's reaching for his pocket as his reaching for a weapon. The defendant told Detective Peterson that he believed Mr. Goins was "trying to kill" him and that, as a result, he "shot three or four times." The defendant said that "something's in the air that [Mr. Goins] had something to do" with Mr. Johnson's murder but claimed that he did not harbor any ill will toward Mr. Goins. He told the detective that he left the area immediately after the shooting and stayed the night in a cemetery in Forrest City, Arkansas. He said that he discarded the gun and his clothes.

Regarding Ms. Wade, the defendant told Detective Peterson that he picked Ms. Wade up from work and took her home, where they argued before he "left to go get . . . something to get high with." He described their argument as "no different than the rest" of the times the two had argued. He said he believed that Ms. Wade was pregnant with his child. When told by the detective that Ms. Wade had been found dead, the defendant claimed ignorance. He insisted that he could not see himself "being in the midst of that no kind of way." He said that Ms. Wade had been "living a double life" and that he believed she might be involved with "one of her baby daddies" who had "just got out" and had been leaving threatening messages on Ms. Wade's voicemail.

Detective Peterson testified that the defendant's uncle, J.D. Duckworth, assisted authorities in recovering Ms. Wade's vehicle and that the car was towed back to Tennessee for examination and forensic testing.

During cross-examination, Detective Peterson acknowledged that he observed a wound to Mr. Stanford's hand "that would be consistent with an individual who had been firing a semiautomatic pistol improperly where the slide would come back and actually remove the top part of your skin from your thumb." On redirect examination, however, he testified that when he asked Mr. Stanford about the wound, Mr. Stanford volunteered to submit to gunshot residue testing.

Briana Holloway testified that the defendant, whom she had known since her family lived in Arkansas, came to Nashville on Easter 2010 and that he began dating Ms. Wade shortly thereafter. She said that on July 19, 2010, the defendant came to the residence

-5-

she shared with her mother and brother in Ms. Wade's vehicle and asked her to "tell Tykee to bring his ass here." She testified that she complied, but Mr. Holloway refused to go and told her to "tell Meko I'm eating." She did as Mr. Holloway requested, and the defendant parked the car and came inside. She recalled that the defendant was dressed in black shorts and a black hoodie but was not wearing a shirt. Inside the house, Ms. Holloway overheard the defendant say, "I just killed this b****, and I'm fixing to go down here and kill Murda and her brothers." After he made the statement, the defendant cocked a handgun. Ms. Holloway said that she went outside, where she saw "Murda and Black G coming up the sidewalk." Shortly thereafter, the defendant came outside, and Ms. Holloway heard four gunshots followed by several more gunshots.

During cross-examination, Ms. Holloway acknowledged that the defendant was very close to Mr. Johnson. Ms. Holloway said that she did not know Ms. Wade's family.

Janeese Cox, Mr. Goins's cousin, testified that she went to the hospital after learning that Mr. Goins had been shot and that she became concerned when Ms. Wade did not arrive at the hospital. She said that several family members attempted to contact Ms. Wade but were unable to do so. Eventually, she said, Ms. Wade's mother contacted Ms. Wade's babysitter. Ms. Cox and Ms. Wade's mother asked Ms. Wade's sister, Latarsha Hill, to drive to Ms. Wade's residence and check on her.

Latarsha Hill testified that she drove to check on Ms. Wade when Ms. Wade did not come to the hospital following Mr. Goins's shooting. Ms. Hill said that the defendant had been living with Ms. Wade and Ms. Wade's six children. She said that she arrived at Ms. Wade's residence at approximately 1:45 p.m., and she noticed that there was blood on the outside window. Ms. Wade's children let Ms. Hill inside the house. Once inside, Ms. Hill observed that Ms. Wade's bedroom door was locked, the radio was on, and the water was running. She kicked down the bedroom door and saw blood everywhere in the room.

Kinardo Wade, Ms. Wade's 11-year-old son, testified that he was the second oldest of six children. On July 19, 2010, the defendant, who had been living with the family, and Ms. Wade "came in, and they was arguing. And then . . . they went in the room." Kinardo said that he and his sisters tried to ask Ms. Wade questions, but Ms. Wade told the children to go to their rooms. She and the defendant, in turn, went into Ms. Wade's bedroom "[a]nd they locked the door and shut it and then cut up the music and then turned the shower on." Kinardo said that he never heard the radio or water go off and that he never heard anything other than the water or radio coming from the room. Kinardo testified that he eventually went to bed. When he awoke, both the radio and the water were still running. Ms. Wade did not wake them as usual to prepare for the morning. Kinardo said that he tried to open Ms. Wade's bedroom door, but it was still locked.

Kinardo testified that a baby sitter arrived in the morning to pick up his sisters and that he told her, "I don't know what my mama's doing." He said that the baby sitter left and returned later that same day. He said that he attempted to prepare food for the other children but was unable to do so. Eventually, he heard a telephone ring, and he answered it and spoke to his aunt. Later, another aunt arrived at the residence. Kinardo said that he was nine years old at the time of the crime.

Wendy Schroder, a neighbor of Ms. Wade, testified that at approximately 9:15 p.m. on July 19, 2010, she saw Ms. Wade's boyfriend drive by in Ms. Wade's car, which Ms. Schroder described as "odd." Ms. Schroder said that she did not know Ms. Wade's boyfriend's name. She recalled that the driver had his arm out the lowered window.

Metro Crime Scene Investigator Felicia Evans testified that when she arrived at Ms. Wade's house, "it appeared as though Ms. Wade had sustained stab wounds, so we wanted to document anything from where a possible weapon could have been obtained from." Ms. Evans recalled that a radio was playing loudly and that "[t]here was blood in several different places throughout the room, just about on every wall, inside the bathroom, on the floors, on the bed, beside her, on an iron, on a green telephone on the floor." She said that the cord from an iron was wrapped around Ms. Wade's neck. Following a brief examination of the body by the medical examiner, Ms. Evans "cut the cord of the iron so that the cord could remain intact around [Ms. Wade's] neck when she was transported to the medical examiner's office" while the "base of the iron" was taken for processing. Technicians lifted bloody fingerprints, swabbed several blood stains, and cut a piece of drywall to preserve a fingerprint.

Lorita Marsh, a supervisor in the Metro Fingerprint Identification Unit, testified that she examined three sets of latent fingerprints and one photograph of a patent fingerprint taken from Ms. Wade's residence. She determined that the fingerprint featured in the photograph was "the left ring fingerprint" of the defendant.

Metro Detective Russell Thompson testified that he acted as the lead investigator into Ms. Wade's murder. During his initial investigation, he learned that Ms. Wade's car was missing from the residence and that Ms. Wade and Mr. Goins were related. Based on his preliminary investigation, Detective Thompson considered the defendant a person of interest "almost immediately," and, as a result, he asked for an expedited comparison of the defendant's fingerprints to the prints found in the residence. After he learned that the prints matched, he obtained a warrant for the defendant's arrest but could not locate him in Davidson County. Detective Thompson said that he learned on July 25, 2010, that the defendant was in police custody in Gwinnett County, Georgia.

Detective Thompson was unable to travel to Georgia to interview the defendant but interviewed the defendant after his return to Tennessee on August 5. During that interview, which was recorded, Detective Thompson obtained deoxyribonucleic acid ("DNA") samples from defendant. Detective Thompson testified that he noticed a serious cut on the middle finger of the defendant's left hand. He said that he later sent the defendant's DNA samples along with other evidence obtained from Ms. Wade's house and car to the Tennessee Bureau of Investigation ("TBI") for forensic testing. A video recording of Detective Thompson's interview with the defendant was played for jury.

During that interview, the defendant insisted that he did not remember "hardly anything" about the night of Ms. Wade's murder. He said that all he could remember was picking Ms. Wade up from work and arguing with her before he dropped her off at home. He said, "I don't remember nothing about doing nothing to Asia." He said he could have gone to her house and found her dead, but he could not "conjure up" the image in his mind. He told Detective Thompson, as he had Detective Peterson, that Ms. Wade was "living a double life." He said that he was "sorry she was dead." The defendant said that he sometimes "blacked out" when he was angry. He denied telling Mr. Holloway that he had killed Ms. Wade. He told Detective Thompson that he would contact the detective if he recalled any details of the murder.

As part of his investigation, Detective Thompson collected Ms. Wade's cellular telephone from the scene. Upon examining the telephone, Detective Thompson learned that a call occurred between Ms. Wade's cellular telephone and a cellular telephone belonging to Mr. Goins at 7:48 p.m. and that three calls were made to the Greyhound bus station in Nashville at 8:13 p.m., 8:14 p.m., and 8:15 p.m. The last call was placed at 8:20 p.m. to an unknown number.

During cross-examination, Detective Thompson testified that although he could not specify with any certainty when Ms. Wade was killed or whether she was killed before or after Mr. Goins, it was his belief that she was killed before Mr. Goins "based on all the evidence that we talked about, people's statements, he was in her car when he got over there."

Associate Medical Examiner Doctor Bridget Eutenier testified that she performed autopsies of both Mr. Goins and Ms. Wade. Mr. Goins's body and medical records were transported to the medical examiner's office from Vanderbilt Medical Center following his brief hospital stay. Doctor Eutenier explained that doctors had performed a craniotomy on Mr. Goins, which is "where they cut through the skull to evaluate the brain." Because doctors made the "surgical incision through the gunshot wound, . . . it made it more difficult to evaluate that gunshot wound." Nevertheless, Doctor Eutenier concluded that Mr.

Goins died from a single gunshot wound to the head. Doctor Eutenier explained that "[i]n addition to doing surgery they had cauterized the wound, which means they tried to stop the bleeding by applying heat, which can alter the outside look of the gunshot wound on the skin." As a result, she was unable to calculate the distance from which the shot had been fired.

Doctor Eutenier testified that the autopsy established that Ms. Wade's cause of death was "[m]ultimodality trauma," which, she explained, means that "[t]here were different types of trauma, which led to her death." Doctor Eutenier said that Ms. Wade suffered a total of 49 stab or incised wounds: nine to her abdomen, 11 to her head, three to the left arm and hand, seven to the buttocks, and 19 to the neck. Additionally, Ms. Wade suffered superficial sharp force injuries to the inside of her elbow, her forearm, and her back. Doctor Eutenier opined that Ms. Wade "was either moving or was being moved at the time since there are injuries to both the front and the back of her body." Doctor Eutenier testified that another mode of death was ligature strangulation by the cord that was around Ms. Wade's neck. Doctor Eutenier was unable to determine whether the strangling or the stabbing occurred first.

TBI Agent and Forensic Scientist Jennifer Shipman testified that forensic testing established that blood discovered on the outside of the driver's side door of Ms. Wade's car belonged to the defendant. Additionally, blood found on a curtain hanging partially outside Ms. Wade's bedroom window also belonged to the defendant. She said that one swab taken from inside Ms. Wade's bedroom contained a mixture of the defendant's and Ms. Wade's blood. Finally, blood on the exterior wall of Ms. Wade's house belonged to the defendant.

Following Ms. Shipman's testimony, the State rested. The defendant elected to present no proof. The jury convicted the defendant as charged of the first degree premeditated murders of Mr. Goins and Ms. Wade, the attempted first degree murder of Mr. Stanford, and employing a firearm during the commission of a dangerous felony.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal to this court. In this appeal, the defendant challenges the trial court's refusal to sever the offenses, the sufficiency of the convicting evidence, and the propriety of the sentence. We consider each claim in turn.

*I. Severance*

The defendant contends that the trial court erred by denying his motion to sever the charge of the first degree premeditated murder of Ms. Wade from the remaining offenses,

arguing that Tennessee Rule of Criminal Procedure 14 required severance of the offenses because the offenses do not qualify as signature crimes, were not part of the same transaction, and were not part of a larger, continuing plan or conspiracy. The State asserts that Tennessee Rule of Criminal Procedure 8 required joinder of the offenses because they were part of a single criminal episode. Alternatively, the State avers that the trial court did not err by refusing to sever the offenses because they were part of a larger, continuing plan or conspiracy.

### A. General Principles

We review the propriety of a trial court's decision regarding the consolidation of indictments or severance of charges for abuse of discretion. *See State v. Garrett*, 331 S.W.3d 392, 401 (Tenn. 2011) (citing *Spicer v. State*, 12 S.W.3d 438, 442 (Tenn. 2000)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *Garrett*, 331 S.W.3d at 401 (citing *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010)).

"Before a trial court may deny a severance request, it must hold a hearing." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). Because the determination whether multiple offenses should be joined or separated for trial establishes a format for trial, the issue obviously must be presented and resolved before trial. *See Garrett*, 331 S.W.3d at 403; *see also* Tenn. R. Crim. P. 13(b) (providing that a trial court may order severance of offenses before trial); Tenn. R. Crim. P. 14(a)(1)(A) (providing that a defendant, except in the event of a later arising ground, shall move to sever offenses "before trial"). The trial court must base its decision regarding severance on "the evidence and arguments presented at the hearing," and, as a result, our review on appeal is limited "to that evidence, along with the trial court's findings of fact and conclusions of law." *Spicer*, 12 S.W.3d at 445; *see also Garrett*, 331 S.W.3d at 404 (where supreme court conducted its "analysis on the basis of the evidence adduced at [the d]efendant's trial instead of only the evidence adduced at the hearing" because trial court failed to hold a pretrial hearing).

### B. Severance Hearing Evidence and Trial Court's Findings of Fact and Conclusions of Law

At the severance hearing, Detective Robert Peterson testified that he participated in the investigation of the June 9, 2010 murder of Michael "Freeze" Johnson at 1217 Hillside Avenue and was later assigned to investigate the July 19, 2010 murder of Mr. Goins and attempted murder of Mr. Stanford at that same address. As part of his investigation of the later murder, Detective Peterson learned that the shooting occurred at approximately 9:35 p.m. and that Mr. Goins died in the hospital on the following day. Detective Peterson then interviewed Tykee Holloway, who had told another detective that

a person named "Meko" had murdered Mr. Goins. According to Detective Peterson, Mr. Holloway told him that "Meko" came to the Holloway residence on July 19, 2010, and said that "he just killed his b****, and he's fixing to kill Murder." He later learned that "Meko" was likely the defendant and that the defendant was a suspect in the murder of Ms. Wade on July 19, 2010, in another part of Nashville. Using this information, Detective Peterson created a photograph array that included the defendant's photograph, and Mr. Holloway positively identified the defendant as "Meko."

Mr. Holloway's sister, Briana Holloway, told Detective Peterson that she, too, heard the defendant say, "I just killed my b****, and I'm fixing to kill Murder." Ms. Holloway also told Detective Peterson that she saw the defendant arrive in a red Monte Carlo that she knew belonged to his girlfriend, Ms. Wade, and leave with a handgun. She then saw the defendant and Mr. Goins outside just before she heard gunfire.

On July 26, 2010, a red Monte Carlo identified as belonging to Ms. Wade was discovered in Gwinnett County, Georgia at the home of the defendant's uncle, J.D. Duckworth. Detective Peterson traveled to Georgia to interview the defendant. During that interview, the defendant admitted that he shot Mr. Goins. According to Detective Peterson, the defendant explained that "there w[ere] problems between" the Holloways, whom he described as his "adopted family," and "Asia Wade's family and Mr. Goins's family" related to the murder of Mr. Johnson. The defendant told Detective Peterson that Ms. Wade and Mr. Goins were cousins and that Mr. Johnson was a brother to Tykee and Briana Holloway. The defendant told Detective Peterson that when he moved to Nashville, the Holloway family, including Mr. Johnson, had taken him in. Detective Peterson said that he could not recall the exact reason for the animosity and only remembered the defendant's "saying there was some conflict between the families."

When questioned about Ms. Wade's murder, the defendant told Detective Peterson that "he didn't think he could do something like that." The defendant admitted to the detective that he had gotten into an argument with Ms. Wade but claimed that he could not "really remember what happened after that." He told Detective Peterson, however, that "[h]e had to drive away and get high" after the argument with Ms. Wade.

During cross-examination, Detective Peterson conceded that the Holloways were the only witnesses that he interviewed in relation to Mr. Goins's murder who mentioned the murder of Ms. Wade or suggested any connection between the two crimes. Detective Peterson also admitted that neither Tykee nor Briana Holloway told him that the defendant gave a reason for murdering Ms. Wade. Detective Peterson, acknowledged that, in fact, no witness had provided any motive for the murder of Ms. Wade, including the defendant himself.

-11-

Upon questioning by the court, Detective Peterson clarified that the defendant arrived at the Holloway residence at approximately 9:00 p.m. When he arrived at the residence, he asked Ms. Holloway, who was standing outside, to ask Mr. Holloway to come outside. She complied, but Mr. Holloway refused, telling her that "he was eating, he wasn't going anywhere, he was enjoying his chicken." After Ms. Holloway told the defendant that Mr. Holloway had refused to come outside, the defendant came inside the house. Once inside the house, the defendant told Mr. Holloway that he had "just killed his b****" and that he was "fixing to go down and kill Murder." Detective Peterson said that Mr. Goins's nickname was "Murder." Ms. Holloway told the detective that she then saw the defendant cock his gun and exit the house to the right. She, too, exited the house but went directly across the street. She then heard gunshots and saw the defendant get into Ms. Wade's car and drive away. Detective Peterson clarified that Ms. Wade was stabbed rather than shot.

Detective Russell Thompson testified that he was assigned to investigate Ms. Wade's murder, which took place at her home on 1609 Elizabeth Road. He said that the residence was "off of Clarksville Highway in the Bordeaux area." Detective Thompson estimated the travel time between Ms. Wade's residence and the location where Mr. Goins and Mr. Stanford were shot as 15 to 20 minutes. Detective Thompson said that Ms. Wade's body was discovered by family members shortly before 2:37 p.m. on July 20, 2010. According to Detective Thompson, Ms. Wade had been "stabbed or cut over forty times," and she "had a ligature from an iron cord around her neck." Additionally, her bedroom was in disarray, and there was blood in the bedroom and an adjacent bathroom. Ms. Wade's red Monte Carlo was missing from the driveway.

Detective Thompson testified that, based upon information he gleaned during his investigation, he estimated that Ms. Wade was murdered at approximately 8:00 p.m. on July 19, 2010. He said that he made this determination based on "[p]hone records and some information from the West case of the time line." He said that a telephone call was placed from Ms. Wade's cellular telephone to Mr. Goins's cellular telephone at 7:48 p.m. followed by "several calls to Greyhound bus station" before the last call was placed at 8:20 p.m. Detective Thompson said that "a neighbor saw [Ms. Wade's] car driving down the road with a black male driving with his left hand hanging out the window that evening in the evening hours of the 19th."

Detective Thompson said that Ms. Wade's minor children were home on July 19, 2010. Her son, Kinardo Wade, who was nine years old at the time, told Detective Thompson that his mother and the defendant argued in Ms. Wade's bedroom with the door locked. Kinardo told Detective Thompson that he "didn't have any contact with them the rest of the night until the next morning when the baby-sitter got there." Detective Thompson said that apparently, when the baby-sitter arrived, Kinardo told her that "their mother wasn't there

and they weren't going with them because the bedroom door had been locked all night." At that point, the baby-sitter left. At some point, Ms. Wade's mother contacted the baby-sitter to ask if she had heard from Ms. Wade "because of what happened with Mr. Goins." When Ms. Wade's mother found out that Ms. Wade did not arrive at work as scheduled, family members traveled to Ms. Wade's residence "and found her car missing, forced entry, and found her." Ms. Wade's landlord told police that the defendant lived with Ms. Wade, and mail and other items taken from the residence confirmed that. Additionally, a bloody fingerprint lifted from a light switch in the bathroom was identified as belonging to the defendant, and DNA testing established the presence of the defendant's blood at Ms. Wade's home and inside Ms. Wade's red Monte Carlo.

Detective Thompson testified that he interviewed the defendant after the defendant was transported to Nashville from Georgia. During that interview, the defendant told Detective Thompson that he could not remember what had happened during his altercation with Ms. Wade. The defendant claimed that he had "blacked out."

Detective Thompson said that Ms. Wade's family informed him immediately that they believed Ms. Wade's death to be related to Mr. Goins's death because the two were cousins.

During cross-examination, Detective Thompson said that it was his recollection that a member of Ms. Wade's family reported that Ms. Wade believed that the defendant might suspect that she or her cousins had played a role in Mr. Johnson's death, but Detective Thompson admitted that he had no proof to support those "rumors."

At the conclusion of the testimony, the State argued that the cases should remain consolidated, primarily because "it would be very difficult" to redact the defendant's statement to distinguish "one incident from the other." In addition, the State asserted that the defendant's statement to the Holloways and the fact that the defendant used Ms. Wade's car to travel to the location of the second murder linked the offenses. The State claimed that proof of Ms. Wade's murder would be necessary at the trial of the murder of Mr. Goins and attempted murder of Mr. Stanford to explain the origin of the defendant's blood inside Ms. Wade's car. The State also argued that the fact that both murders were motivated by the earlier murder of Mr. Johnson tied the two crimes together.

The defendant argued that the two crimes were not so interrelated, pointing out that "no admissible evidence" existed to tie either crime to the murder of Mr. Johnson and that the two crimes were carried out in very different ways. The defendant also noted that there were eyewitnesses to the shooting of Mr. Goins, including Mr. Stanford, who was wounded in the shooting, and that the defendant admitted shooting Mr. Goins. The

-13-

defendant argued that the fact that the defendant drove Ms. Wade's car to the location where he then murdered Mr. Goins was not necessary to establish that the defendant killed Mr. Goins. The defendant claimed that "the only thing that really ties these things together evidentiary-wise" is the defendant's statement to Mr. Holloway, which he contended "could easily be redacted in the two trials."

In its written order denying the defendant's motion to sever the offenses, the trial court "agree[d] with the State and [found] that the testimony about both murders indicate[s] that there was a common scheme or plan in that the offenses were part of a larger continuing plan." In support of this finding, the trial court noted that "the murders occurred approximately within one hour of each other, the telephone records indicate that there were calls between the two victims shortly before Asia Wade's murder," "testimony regarding when [the d]efendant was seen in Asia Wade's Monte Carlo also relates to both cases," and "both the stabbing and shooting are intertwined in the" defendant's interview with police. The court also observed that "[i]n light of the fact that the two murders are interconnected, . . . the probative value of the evidence is not outweighed by the prejudicial [effect]."

*C. Relationship Between Procedure Rules 8 and 14 and Evidence Rule 404(b)*

Here, all the offenses were charged in a single indictment. Tennessee Rule of Criminal Procedure 8 governs both mandatory and permissive joinder of offenses. Pursuant to that rule, offenses must be joined if they are:

> (A) based on the same conduct or arise from the same criminal episode;
>
> (B) within the jurisdiction of a single court; and
>
> (C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Tenn. R. Crim. P. 8(a). Offenses may be joined for trial if "(1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Regardless whether the joinder of offenses was mandatory or permissive, the defendant may file for a severance of offenses pursuant to Tennessee Rule of Criminal Procedure 14. In cases of mandatory joinder, when the defendant asks for a severance prior to trial, "the court shall grant a severance of offenses . . . when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2). In cases of permissive joinder, "the defendant has the

-14-

right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

Thus, the first question we must answer is whether the joinder of offenses in a single indictment in this case was mandatory or permissive. On appeal, the State cites *State v. Johnson*, 342 S.W.3d 468 (Tenn. 2011), in support of its argument that joinder was mandatory because "the defendant's crimes occurred in a close sequence of time and were 'inextricably connected.'" At the severance hearing, the State argued similarly that the offenses were "interlocked together" and that the offenses were part of "one criminal episode." The State relied on the defendant's statement to Mr. Holloway, Ms. Wade's alleged telephone call to Mr. Goins shortly before her murder, and the defendant's use of Ms. Wade's car to drive to the location of the shooting as evidence that the crimes were part of the same criminal episode. The trial court, however, did not find that joinder of the offenses was mandatory and instead based its decision on the principles in Rule 14(b)(1) relative to the severance of permissibly joined offenses. We agree with the trial court's implicit holding that joinder of the offenses in this case was not mandatory.

In *Johnson*, our supreme court adopted "the criteria for a 'single criminal episode' found in the ABA Standards for Criminal Justice." *State v. Johnson*, 342 S.W.3d 468, 475 (Tenn. 2011). Under those standards, for principles of mandatory joinder to apply, "the acts to be included in the same criminal episode must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." *Id.* The court observed that

> in order for a single criminal episode to exist, the "proof of one offense necessarily involves proof of the others." 2 ABA Standards for Criminal Justice § 13-1.3 cmt., at 13.10. This means that the proof of one offense must be 'inextricably connected' with the proof of the other, *see State v. Shepherd*, 902 S.W.2d 895, 904 (Tenn. 1995), or that the proof of one offense forms a "substantial portion of the proof" of the other offense. *See United States v. Montes-Cardenas*, 746 F.2d 771, 776 (11th Cir. 1984).

*Id.*

The evidence adduced at the severance hearing established that Ms. Wade was murdered in the Bordeaux area of Nashville at approximately 8:20 p.m., but Mr. Goins was murdered in a separate location some 15 to 20 minutes away at approximately 9:35 p.m.

Thus, although the offenses were committed within a relatively short period of time, they were not committed "simultaneously or in close sequence" and did not "occur in the same place or in closely situated places." *See Johnson*, 342 S.W.3d at 475. Moreover, no evidence established that the proof of any of the offenses "necessarily involve[d] proof of the others." *See id.* To be sure, some of the evidence, particularly the defendant's statements to the Holloways and to police, is relevant and admissible as to each of the charged offenses. That being said, proof that the defendant murdered Ms. Wade does not "necessarily involve" proof that he murdered Mr. Goins and attempted to murder Mr. Stanford, nor does proof of Ms. Wade's murder make up a "substantial portion" of the proof regarding the remaining two offenses. Similarly, proof that the defendant murdered Mr. Goins and attempted to murder Mr. Stanford does not necessarily involve or make up a substantial portion of the proof of Ms. Wade's murder.

In consequence, the joinder of the offenses in this case qualifies as permissive rather than mandatory. Accordingly, the defendant had "the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

As our supreme court has observed,

> the "primary issue" to be considered . . . is whether evidence of one offense would be admissible in the trial of the other[s] if the . . . offenses remained severed. In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is "really a question of evidentiary relevance."

*Garrett*, 331 S.W.3d at 402 (citations omitted). Because joining offenses involves admitting proof of crimes committed on one occasion while attempting to prove crimes committed on a separate occasion, the provisions of evidence rule 404(b) are implicated. *Id.* That rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Such "other purposes" include "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." *Id.*, Advisory Comm'n Commts. Because of "the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge," *see Garrett*, 331 S.W.3d at 402, "any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant," *see id.* at 403.

Here, the trial court concluded that the offenses in this case formed part of a common scheme or plan.

> In Tennessee, there are three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

*Shirley*, 6 S.W.3d at 248 (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 404.11, at 180 (3d ed. 1995)). The offenses in this case clearly do not qualify as "signature crimes" as they were committed by entirely different means. Moreover, no proof exists to suggest that they were part of the same criminal transaction. Indeed, the trial court concluded that the offenses were part of a larger, continuing plan.

"[A] larger, continuing plan or conspiracy 'involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed.'" *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447). "This category of continuing plan or conspiracy requires proof of 'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" *State v. Prentice*, 113 S.W.3d 326, 331 (Tenn. Crim. App. 2001) (quoting *Hoyt*, 928 S.W.2d at 943, *overruled on other grounds by Spicer* 12 S.W.3d at 447). "[S]hared motivation for two otherwise unrelated crimes," however, " is not sufficient to establish a 'common scheme or plan.'" *Prentice*, 113 S.W.3d at 332 (citing *State v. Adams*, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)).

Here, the severance hearing evidence established that Ms. Wade was strangled and stabbed more than 40 times sometime before 8:20 p.m. at her home on July 19, 2010. The defendant, whose blood was found at the scene of Ms. Wade's murder, arrived at the Holloway residence on Hillside Avenue at approximately 9:00 p.m. in Ms. Wade's red Monte Carlo. While there, he told Mr. Holloway that he had just killed Ms. Wade and that he intended to kill Mr. Goins. Additionally, the defendant armed himself with a handgun before going to confront Mr. Goins. He then shot both Mr. Goins and Mr. Stanford in front of a residence only a short distance from the Holloway residence. He fled the scene and was discovered in possession of Ms. Wade's vehicle in Georgia. Although the State claimed that the defendant's suspicions regarding the role that Ms. Wade and Mr. Goins, who were cousins, played in the death of his close friend, Mr. Johnson, the State presented no proof at the hearing to support this theory. The only suggestion that Mr. Johnson's death might have motivated the defendant to kill both Ms. Wade and Mr. Goins came from Detective

-17-

Thompson's testimony that "rumors" existed that suggested such a motive and that a family member or friend of Ms. Wade's had said that Ms. Wade believed the defendant might be suspicious of her role in Mr. Johnson's death. Notably, Detective Thompson offered no testimony to support the State's theory that the murder of Mr. Goins was motivated by the earlier murder of Mr. Johnson. Moreover, that the defendant's statement would be difficult to redact for separate trials is completely irrelevant to a determination whether the offenses should be severed.

Thus, we are left with three crimes committed by the defendant on the same day against three different people, two of whom were related to one another. The offenses were committed by different means in different locations. Additionally, the defendant admitted that he shot Messrs. Goins and Stanford, but he claimed a lack of memory with regard to Ms. Wade's murder. The defendant's admission to Mr. Holloway that he had just killed Ms. Wade was relevant and admissible to prove that he had killed her and that he had done so with premeditation. Additionally, the portion of that same statement wherein the defendant expressed a plan to kill Mr. Goins was relevant and admissible to prove that he killed Mr. Goins and attempted to kill Mr. Stanford with premeditation. Proof that the defendant had, in fact, murdered Ms. Wade does not make it more or less probable that he then murdered Mr. Goins and attempted to murder Mr. Stanford. The State asserts that because the defendant's statement to Mr. Holloway and his statement to police would be admissible at severed trials, consolidation was proper. The relevant inquiry, however, is not whether some of the same evidence would be admissible at separate trials but whether proof of one offense would be admissible in a trial of the others. Oftentimes, the proof of one offense may serve to identify the perpetrator of other offenses, and such is clearly not the case here. We hold that the trial court erred by denying the defendant's severance motion.

### D. Harmless Error

Having determined that the trial court erred by refusing to sever the offenses, we must next determine whether the error was harmless. *Garrett*, 331 S.W.3d at 405 (citing *Spicer*, 12 S.W.3d at 447). "In making this determination, we consider the whole record and focus on the 'impact the error may reasonably be taken to have had on the jury's decision-making.'" *Id.* (quoting *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008)).

> In this regard, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which [the] proof exceeds the standard required to convict . . . .'" *Spicer*, 12 S.W.3d at 447 (quoting *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979)). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable

-18-

doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" *Toliver*, 117 S.W.3d at 231 (quoting *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000)). Nevertheless, we must remain focused not simply on the weight of the evidence, but on 'the actual basis for the jury's verdict.' *Rodriguez*, 254 S.W.3d at 372.

*Id.*

The proof of the defendant's guilt for each offense in this case was overwhelming. The defendant admitted to the Holloways that he had killed Ms. Wade and that he intended to kill Mr. Goins. Kinardo Wade testified that the defendant and his mother entered his mother's bedroom on the evening of July 19, 2010, and never came out. A neighbor saw the defendant drive by in Ms. Wade's car that same evening, and Ms. Holloway testified that the defendant arrived at the Holloway residence driving Ms. Wade's automobile. The defendant's blood was discovered inside Ms. Wade's car as well as inside her bedroom and on a curtain and the exterior of her bedroom window. The defendant admitted shooting Mr. Goins, and the proof established that Mr. Stanford was wounded in that same shooting. Under these circumstances, we cannot say that the trial court's failure to sever the offenses more probably than not affected the outcome of his trial. We hold that the error is harmless and does not result in reversal.

## II. Sufficiency

The defendant contends that the evidence was insufficient to support his convictions. We review the defendant's challenge to the sufficiency of the evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be

drawn from the evidence. *Id.*

### A. First Degree Murder of Asia Wade

The defendant asserts that the State failed to establish his identity as the murderer of Ms. Wade and further failed to establish that he acted with premeditation.

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007)*; see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Here, the evidence established that Ms. Wade was strangled with the cord from an iron and stabbed some 49 times before being left for dead on the same night that her children overheard her arguing with the defendant inside her locked bedroom. No proof showed that Ms. Wade was armed. Forensic testing identified the presence of the

-20-

defendant's blood mixed with Ms. Wade's blood inside her bloody bedroom. His blood was also present on a curtain and the exterior of the house near her bedroom window as well as inside her car. A neighbor saw the defendant driving Ms. Wade's car away from the residence, and the defendant arrived at the Holloway residence in Ms. Wade's car. Both Tykee and Briana Holloway testified that the defendant said that he had "just killed his b****," which they both understood as a reference to Ms. Wade. Neither described the defendant as anything other than calm during the encounter. Under these circumstances, the evidence sufficiently established that the defendant murdered Ms. Wade and that he did so with premeditation.

### B. First Degree Murder of Clarence Goins

The defendant challenges his conviction of the first degree premeditated murder of Mr. Goins on grounds that the State failed to prove that he acted with premeditation. He also claims that "there is evidence in the record that would support a finding that the defendant acted in self-defense or upon adequate provocation."

The proof adduced at trial established that the defendant arrived at the Holloway residence intent on killing Mr. Goins, telling the Holloways that he was "fixing to" murder Mr. Goins, whom he called by the street name "Murda." At some point, the defendant armed himself with a handgun that he deliberately cocked before leaving the residence. Both Mr. Stanford and Ms. Horne testified that the shooter called out to Mr. Goins and asked if he had any "salt" before shooting him. The defendant then fired a number of shots, striking Mr. Goins, who was unarmed, in the head one time. Mr. Goins succumbed to his injury the following day. The defendant did not deny that he shot Mr. Goins. This evidence was sufficient to support the defendant's conviction of the first degree premeditated murder of Mr. Goins.

As to the defendant's claims regarding self-defense and adequate provocation, we note that the trial court provided jury instructions on self-defense and voluntary manslaughter, and each was rejected by the jury. Indeed, the only proof of either was the defendant's self-serving statement to police following his arrest. No other evidence supported the defendant's claim that Mr. Goins was armed.

### C. Attempted First Degree Murder of Patrick Stanford

The defendant claims that the State failed to establish his identity as the person who shot Mr. Stanford and failed to establish that the defendant acted with premeditation because, he asserts, no evidence established that the defendant declared an intent to kill Mr. Stanford or that he made preparations to do so. The State contends that there was sufficient

evidence to establish the defendant's identity as Mr. Stanford's shooter and that the fact that Mr. Stanford was not the defendant's intended victim does not undermine his conviction of attempted first degree murder.

As indicated, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202. As charged in this case, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. §39-12-101(a)(2).

The proof established that the defendant traveled to the Hillside Avenue Apartments intent on killing Mr. Goins, that he expressed an intent to kill Mr. Goins, that he procured a weapon for the purpose of killing Mr. Goins, and that he did, in fact, kill Mr. Goins with the weapon he procured. The proof also showed, however, that Mr. Stanford, who was walking with Mr. Goins when the defendant came upon them and began firing his handgun, was wounded. That the defendant did not express a desire to kill Mr. Stanford does not affect his conviction of the attempted first degree murder of Mr. Stanford. Our supreme court has observed that "[a] plain reading" of the first degree murder statute "indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, *i.e.*, 'cause the result.'" *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999). The court held that so long as "the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (*i.e.*, intended result), is first degree murder." *Id.* Accordingly, because the evidence sufficiently established that the defendant intended to cause the death of Mr. Goins and that he did so with premeditation, his attempt on Mr. Stanford's life qualifies as attempted first degree murder.

Although the defendant claims that the State failed to establish his identity as Mr. Stanford's shooter, claiming that the presence of different shell casings and witness reports of two bursts of gunfire suggest the presence of more than one shooter, the overwhelming bulk of the evidence established that the defendant was, in fact, the only shooter present. The jury clearly rejected all inferences to the contrary, as was its prerogative. In sum, the evidence was sufficient to support the defendant's conviction of the attempted first degree murder of Mr. Stanford.

### D. *Employing a Firearm During the Commission of a Dangerous Felony*

The defendant claims that because the evidence did not support his conviction

of the attempted first degree murder of Mr. Stanford, it likewise did not support his conviction of employing a firearm during the commission of a dangerous felony. In a related claim, he contends that his firearm conviction must fall because the State failed to allege a predicate felony in the indictment.

We may easily dispense with the defendant's claim related to the sufficiency of the evidence because, as discussed more fully above, the evidence overwhelmingly supported his conviction of the attempted first degree murder of Mr. Stanford. We turn to his claim regarding the indictment.

Initially, we note that the State appears to make a passing claim that the defendant's claim regarding the sufficiency of the indictment has been waived, noting that the defendant failed to raise the issue in his motion for new trial. Because the remedy, should this court find the defendant's claim meritorious, would be a dismissal of the indictment rather than a remand for a new trial, he need not have raised it in his motion for new trial to preserve the claim for plenary review. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) ("The waiver provision of Rule 3(e), however, does not apply when the issue, if found to be meritorious, would result in the dismissal of the prosecution against the accused.").

Similarly, because the defendant's claim is that the indictment for employing a firearm during the commission of a felony failed to charge that offense, it is not barred by Tennessee Rule of Criminal Procedure 12. That rule provides that challenges to the indictment, other than "a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense," must be raised prior to trial. Tenn. R. Crim. P. 12(b).

Challenges to the legal sufficiency of an indictment present questions of law subject to de novo review on appeal. *See State v. Wilson*, 31 S.W.3d 189, 191 (Tenn. 2000); *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997). "[T]he Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee to the accused the right to be informed of the nature and cause of the accusation." *Hill*, 954 S.W.2d at 727. As a general rule, "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for

the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *Id.* (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)). Tennessee Code Annotated section 40-30-202 provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. In no case are the words "force and arms" or "contrary to the form of the statute" necessary.

T.C.A. § 40-30-202 (2006). "[T]he touchstone for constitutionality is adequate notice to the accused." *Hill*, 954 S.W.2d at 729

As charged in this case, "it is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." T.C.A. § 39-17-1324(b)(1). The indictment in this case alleged that the defendant employed a firearm during the commission of a dangerous felony but did not allege any of the enumerated dangerous felonies in Code section 39-17-1324. *See id.* § 39-17-1324(i)(1). The defendant, citing *State v. Michael L. Powell and Randall S. Horne*, No. E2011-00155-CCA-R3-CD (Tenn. Crim. App., Knoxville, May 10, 2012), and *State v. Christopher Ivory Williams*, No. W2009-01638-CCA-R3-CD (Tenn. Crim. App., Jackson, May 9, 2011), asserts that the omission of the predicate felony rendered the indictment "fatally defective." The State contends that "the indictment provided sufficient information as to what elements of the crime the defendant had to defend against."

In *State v. Michael L. Powell and Randall S. Horne*, this court, citing *State v. Christopher Ivory Williams*, noted that the State's failure to allege a predicate felony in an indictment for a violation of Code section 39-17-1324 "present[ed] a close question" but ultimately concluded that it was "not necessary to determine whether the indictment was adequate to charge the firearms offenses" given other issues attendant to that conviction. *State v. Michael L. Powell and Randall S. Horne*, No. E2011-00155-CCA-R3-CD, slip op. at 18 (Tenn. Crim. App., Knoxville, May 10, 2012). In *Christopher Ivory Williams*, this court addressed Williams' claim "that because the felony murder count did not specify the underlying felony, it failed to place him on notice of the appropriate mens rea for the underlying offense and failed to fulfill the requirements set out in *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)." *State v. Christopher Ivory Williams*, No. W2009-01638-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Jackson, May 9, 2011). We observed that although "the State intended to prove that the killing was committed in the perpetration of kidnapping or

-24-

robbery . . . neither of these underlying offenses were specifically stated in the felony murder count of the indictment." *Id.*, slip op. at 12. Noting that "the underlying felonies listed in section 39-13-202(a) have differing mens rea" and that "[p]roof of the intent to commit the underlying felony, and at what point it existed, [are] question[s] of fact to be decided by the jury after consideration of all the facts and circumstances," we concluded that the failure to include a predicate felony in the felony murder indictment "failed to provide Williams with notice of the underlying offense and its mens rea, which resulted in an invalid indictment and precluded a lawful felony murder conviction." *Id.*

As we pointed out, felony murder is different from most other offenses in that, in essence, it borrows the mens rea necessary for conviction from the predicate felony and does not, itself, include a specific mens rea. As described by our supreme court, "the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder." *State v. Buggs*, 995 S.W.2d 102 (Tenn. 1999). "No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony." *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005).

Although Code section 39-17-1324(a) provides that "[i]t is an offense to possess a firearm *with the intent to go armed* during the commission of or attempt to commit a dangerous felony," T.C.A. § 39-17-1324(a) (emphasis added), Code section 39-17-1324(b), which the defendant was accused of violating, does not include such a mens rea requirement. Instead that section provides:

It is an offense to employ a firearm during the:

(1) Commission of a dangerous felony;

(2) Attempt to commit a dangerous felony;

(3) Flight or escape from the commission of a dangerous felony; or

(4) Flight or escape from the attempt to commit a dangerous felony.

*Id.* § 39-17-1324(b). The statute requires that the underlying dangerous felony be included as a separate count in the same indictment, *see id.* § 39-17-1324(d) ("A violation of subsection (a) or (b) is a specific and separate offense, which shall be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the

dangerous felony."), but it is silent on whether the predicate dangerous felony must be named in the count charging a violation of Code section 39-17-1324.

Generally, an indictment for a violation of Code section 39-17-1324 that does not name the underlying dangerous felony does not provide the defendant with adequate notice of the crime charged. This is so even when the indictment, as does the one in this case, tracks the statutory language of Code section 39-17-1324 and names the statute itself. These statutory references are insufficient because Code section 39-17-1324 provides 11 options for dangerous felonies that would support conviction. The failure of the indictment to name the underlying dangerous felony leaves the defendant with inadequate notice of the charges against him. Only "'where the constitutional and statutory requirements outlined in Hill are met,'" will "'an indictment that cites the pertinent statute and uses its language'" be deemed "'sufficient to support a conviction.'" *State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999) (quoting *State v. Ruff*, 978 S.W.2d 95, 100 (Tenn. 1998)).

That being said, that the charge of employing a firearm during the commission of a dangerous felony was part of a four-count indictment that included the charge of attempted first degree murder that the State intended to serve as the predicate felony for the firearms offense saves that count in this case. Although "[e]ach count must be a complete indictment within itself, charging all the facts and circumstances that make the crime," *State v. Lea*, 41 Tenn. 175, 177-78 (Tenn. 1860), where "it is reasonably clear from the averments of the second count that this is connected with and a part of the preceding count . . . such a count may be considered good." *State v. Youngblood*, 287 S.W.2d 89, 91 (Tenn. 1956); *see also State v. Cureton*, 38 S.W.3d 64, 82 (Tenn. Crim. App. 2000) (holding, post-*Hill*, that where all counts in an indictment referred to the same victim, the same offense date, and were related to each other, the counts could be read together for purposes of providing notice to the defendant); *State v. James Ruben Conyers*, No. M2002-01007-CCA-R3-CD, slip op. at 19 (Tenn. Crim. App., Nashville, Sept. 5, 2003) (holding that a count charging attempted first degree murder that was otherwise invalid for failure to name a victim could be read together with the other counts of the indictment to supply the name of the victim because the defendant was charged via a single-page indictment with three offenses committed against the same victim on the same date).

In this case, although each count of the indictment appears on a separate page and there are two different victims, only the charge of attempted first degree murder qualifies as a dangerous felony under Code section 39-13-1324. We believe it is "reasonably clear" that the charge of employing a firearm during the commission of a dangerous felony is connected to the count of attempted first degree murder such that the indictment is not void for lack of notice. *Youngblood*, 287 S.W.2d at 91. Thus, the failure of the State to specify the predicate felony in does not void the indictment in this case.

-26-

*III. Sentencing*

Finally, the defendant contends that the trial court erred by imposing partially consecutive sentences. Since the passage of the 1989 Sentencing Act, our standard of review when considering challenges to the length and manner of service of a sentence has been de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006) ("When reviewing sentencing issues raised pursuant to subsection (a), including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct."). In 2005, the general assembly amended the Sentencing Act to bring our sentencing law into compliance with federal constitutional requirements as enunciated in *Blakely v. Washington*, 542 U.S. 296 (2004), and its progeny. Notably, the 2005 revisions rendered advisory the enhancement and mitigating factors and removed the presumptive sentence to be imposed by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In a number of cases following passage of the 2005 amendments, our supreme court signaled that the statutorily prescribed standard of review, de novo with a presumption of correctness, might be at odds with what had become a far more discretionary sentencing scheme. *See, e.g.*, *Carter*, 254 S.W.3d at 344, 346. In *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012), the court again wrestled with the "the precise metes and bounds of appellate review under the current increased trial court discretion structure" but ultimately left the issue unsettled. *State v. Cross*, 362 S.W.3d 512, 529 (Tenn. 2012). The court visited the issue most recently in *State v. Bise*, and ultimately concluded that "although the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* The court held that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness'" afforded to sentencing decisions of the trial court. *Id.* at 708.

The supreme court observed, however, that in making its sentencing decision, a trial court must consider the principles of sentencing enumerated in Code section 40-35-210(b):

> (1) The evidence, if any, received at the trial and the sentencing hearing;

-27-

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*see Bise*, 380 S.W.3d at 698 n.33(citing T.C.A. § 40-35-210(b)), 706 n.41. By statute, the trial court must also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from" the Sentencing Act. *Bise* at 706. Thus, under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The Sixth Amendment considerations attendant to the trial court's imposition of sentence length are not implicated by the trial court's decision regarding alignment of sentences. *See Oregon v. Ice*, 555 U.S. 160, 172 (2009); *State v. Allen*, 259 S.W.3d 671, 688 (Tenn. 2008) (ruling Sixth Amendment *Blakely* challenges inapplicable to consecutive sentencing). Consequently, our standard of review when considering challenges to the alignment of sentences remains de novo with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006); *see also id.* § 40-35-401(a) ("The

defendant in a criminal case may appeal from the length, range or manner of service of the sentence imposed by the sentencing court. The defendant may also appeal the imposition of consecutive sentences."). The presumption of correctness afforded the trial court is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id.*

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Code section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences:
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Here, the trial court concluded that the defendant fit into the fourth category, that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: (1) the court must find consecutive sentences are reasonably related to the severity of the offenses committed and (2) that consecutive sentences are necessary to protect the public from further criminal conduct. *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995); *see also State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

Here, the trial court ordered the life sentences imposed for the murders of Mr. Goins and Ms. Wade to be served consecutively based upon its finding that the defendant was " a dangerous offender whose behavior indicates little or no regard for human life and has no hesitation about committing a crime in which the risk to human life is high."[1] The court also concluded that "under the facts and circumstances of this case, consecutive sentences are appropriate considering the violent nature of both of these offenses that happened back to back that indicates that it's necessary to protect the public from further serious conduct by the defendant."

In our view, the record supports the sentencing decision of the trial court. The defendant brutally murdered Ms. Wade in her home while her children played in the next room. He then drove 15 to 20 minutes to Hillside Avenue, where he confessed the murder of Ms. Wade and declared his intention to murder Mr. Goins before arming himself with a gun and proceeding into the street, where others like Ms. Horne were enjoying the summer evening. He fired at least four shots into the street, striking Mr. Goins in the head and Mr. Stanford, an innocent bystander, in the leg. This evidence clearly sustains a finding that the

---

[1]The defendant's sentence for employing a firearm during the commission of a dangerous felony was ordered to be served consecutively to his sentence of 22 years for attempted first degree murder as required by statute. *See* T.C.A. § 39-17-1324(e)(1) ("A sentence imposed for a violation of subsection (a) or (b) shall be served consecutive to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony.").

defendant was a dangerous offender and that consecutive sentencing is reasonably related to the very severe offenses and necessary to protect the public from further such conduct by the defendant.

*Conclusion*

Although the trial court erred by denying the defendant's motion to sever the offenses, the error can be classified as harmless. The evidence was sufficient to support each of the defendant's convictions. The failure of the indictment for employing a firearm during the commission of a dangerous felony to specify the dangerous felony does not, in this case, result in a defective indictment. Finally, the record fully supports the sentencing decision of the trial court. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE